# In the United States Court of Federal Claims

No. 18-249C
(Filed: February 25, 2019)

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Keywords: Nuclear Regulatory Commission; Illegal Exaction; Civil Penalties; Civil Sanctions; Enforcement Actions; <u>Auer</u> Deference; Regulatory Interpretation. |

*Gordon A. Coffee*, Winston & Strawn LLP, Washington, DC, for Plaintiff. *Tyson R. Smith*, Winston & Strawn LLP, San Francisco, CA, and *Zachary B. Cohen*, Winston & Strawn LLP, Washington, DC, Of Counsel.

*Jessica R. Toplin*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *L. Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General. *Andrew P. Averbach*, *Michael J. Clark*, U.S. Nuclear Regulatory Commission, Of Counsel.

## **OPINION AND ORDER**

**KAPLAN, Judge.**

      In this case, which is currently before the Court on the government's motion to dismiss and the plaintiff's cross-motion for summary judgment as to liability, Plaintiff Honeywell International Inc. ("Honeywell") seeks approximately $2 million in damages based on what it alleges was an illegal exaction of certain fees by the Nuclear Regulatory Commission ("NRC"). The resolution of the parties' motions is entirely dependent on the interpretation and application of an NRC regulation codified at 10 C.F.R. § 170.31 n.2. Specifically, the question before the Court is whether, under that regulation, Honeywell must individually bear (through the payment of fees charged under 10 C.F.R. Part 170) the costs of certain services the NRC provided in connection with a Confirmatory Order it issued to Honeywell, or whether those costs are instead to be funded collectively through the annual fees paid by NRC licensees and certificate holders under 10 C.F.R. Part 171.

For the reasons set forth below, the Court agrees with Honeywell that under 10 C.F.R. § 170.31 n.2, Honeywell may not be charged fees for the services the NRC provided in connection with the Confirmatory Order. Therefore, the government's motion to dismiss is **DENIED** and Honeywell's cross-motion for summary judgment as to liability is **GRANTED**.

## BACKGROUND

### I.      Statutory and Regulatory Framework

The NRC is an independent agency that is charged with regulating "the Nation's civilian use of radioactive materials to provide reasonable assurance of adequate protection of public health and safety and to promote the common defense and security and protect the environment." About NRC, U.S. Nuclear Regulatory Comm'n, https://www.nrc.gov/about-nrc.html (last updated Feb. 12, 2018). By statute, the NRC "is required to recover nearly all of its costs of regulating the nuclear power industry from the licensees that it supervises." Consol. Edison Co. of N.Y., Inc. v. Entergy Nuclear Indian Point 2, LLC, 676 F.3d 1331, 1336 (Fed. Cir. 2012) (citing 42 U.S.C. § 2214). It does so primarily through two types of fee assessments.

First, "[p]ursuant to section 9701 of title 31, any person who receives a service or thing of value from the Commission" must pay "fees to cover the Commission's costs in providing any such service or thing of value." 42 U.S.C. § 2214(b). Fees for such services must be "fair" and based on factors that include "the value of the service or thing to the recipient." 31 U.S.C. § 9701(b)(1), (2)(B). Second, in accordance with 42 U.S.C. § 2214(a) and (c), most NRC licensees and certificate holders pay an annual fee. Annual fees must "[t]o the maximum extent practicable . . . have a reasonable relationship to the cost of providing regulatory services." 42 U.S.C. § 2214(c)(3).

The NRC's assessment of fees for services to individual entities is guided by the principles set forth in Office of Management and Budget ("OMB") Circular A-25, which "establishes Federal policy regarding fees assessed for Government services." Office of Mgmt. & Budget, Exec. Office of the President, OMB Circular A-25 Revised, "User Charges" ("OMB Circular A-25") ¶ 1, https://obamawhitehouse.archives.gov/omb/circulars_a025/. It states that "[w]hen a service (or privilege) provides special benefits to an identifiable recipient beyond those that accrue to the general public, a charge will be imposed (to recover the full cost to the Federal Government for providing the special benefit, or the market price)." Id. ¶ 6.a.1. On the other hand, the Circular provides, "[n]o charge should be made for a service when the identification of the specific beneficiary is obscure, and the service can be considered primarily as benefiting broadly the general public." Id. ¶ 6.a.4.

The NRC implements the statutory requirements and OMB guidelines through regulations codified at Parts 170 and 171 of Title 10 of the Code of Federal Regulations. Under those regulations, "Part 170 fees" are charged to licensees for services that the NRC provides for their individual benefit, such as reviewing license applications, conducting document reviews, and performing inspections. See 10 C.F.R. §§ 170.12(a)–(c), 170.31 ¶ 2.A & n.1; see also Revision of Fee Schedules; 100% Fee Recovery, 56 Fed. Reg. 14,870, 14,870–71 (proposed Apr. 12, 1991) (to be codified at 10 C.F.R. pts. 71, 170 & 171) (observing that Part 170 fees are charged for "individually identifiable services to specific applicants for, and holders of, NRC

licenses and approvals" and are not intended to cover "generic activities that benefit licensees [or the public] generally"). Annual "Part 171 fees," on the other hand, are "generic fees" that are charged to most licensees and certificate holders; they "cover the costs of activities such as the development and provision of regulatory guidance, 'research,' and 'other safety, environmental, and safeguards activities'" whose costs are spread across the regulated industry. Consol. Edison Co., 676 F.3d at 1337 (quoting 10 C.F.R. § 171.15) (internal alteration omitted).

As noted above, this case concerns the interpretation of 10 C.F.R. § 170.31, which sets forth a fee schedule applicable to services performed in connection with applications for licenses, document reviews, inspections, and similar activities. See 10 C.F.R. § 170.31 n.1 (services covered involve "pre-application consultations and reviews; applications for new licenses, approvals, or license terminations; possession-only licenses; issuances of new licenses and approvals; certain amendments and renewals to existing licenses and approvals; safety evaluations of sealed sources and devices; generally licensed device registrations; and certain inspections"). Particularly relevant to the issues presented in this case is footnote 2 to 10 C.F.R. § 170.31 ("Footnote 2"). That note carves out an exception to the general rule that the costs of the services described in the regulation be paid through fees assessed to individual licensees under Part 170. It states in pertinent part as follows:

> Fees will not be charged for orders related to civil penalties or other civil sanctions issued by the Commission under 10 C.F.R. § 2.202 or for amendments resulting specifically from the requirements of these orders. For orders unrelated to civil penalties or other civil sanctions, fees will be charged for any resulting licensee-specific activities not otherwise exempted from fees under this chapter.

10 C.F.R. § 170.31 n.2.

The issue before the Court in this case concerns the scope of the exception set forth in Footnote 2. Specifically, the Court must determine whether the exception covers the document review, inspections, and related work the NRC performed in connection with the enforcement of the Confirmatory Order it issued on October 15, 2012 to secure Honeywell's compliance with certain regulations at one of its nuclear facilities. The NRC charged Honeywell some $2 million dollars in Part 170 fees for those services, based on the agency's conclusion that the Confirmatory Order was not an "order related to civil penalties or other civil sanctions"—as would be required to qualify for the Footnote 2 exception. Honeywell disagrees and contends that the collection of the fees violated applicable regulations and constituted an illegal exaction.

## II.    Facts Underlying the Fee Dispute[1]

### A.    <u>The NRC's Identification of Regulatory Violations at Metropolis Works</u>

Honeywell operates the Metropolis Works Facility ("Metropolis Works"), a nuclear facility in Metropolis, Illinois. Metropolis Works "convert[s] uranium ore into uranium

---

[1] The facts set forth in this section are drawn from the parties' pleadings and exhibits and are not in dispute.

hexafluoride (UF$_6$), which other facilities use to produce uranium that is converted into fuel for nuclear power plants." Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1, ECF No. 12 (citing Compl. ¶¶ 13–14, ECF No. 1). Pursuant to 10 C.F.R. Part 40, the facility is operated under Materials License SUB-526, originally issued by the NRC's predecessor (the Atomic Energy Commission) in 1958. Id.

On March 11, 2011, a magnitude 9.0 earthquake occurred near the east coast of Japan, triggering a 45-foot tsunami that caused catastrophic damage to the Fukushima Daiichi Nuclear Facility. Japan Lessons Learned (ARCHIVED), U.S. Nuclear Regulatory Comm'n, https://www.nrc.gov/reactors/operating/ops-experience/japan-dashboard.html (last updated Jan. 16, 2019). Six months after the disaster, the NRC issued Temporary Instruction 2600/015, entitled "Evaluation of Licensee Strategies for the Prevention and/or Mitigation of Emergencies at Fuel Facilities." NRC Temporary Instruction 2600/015 (Sept. 30, 2011), www.nrc.gov/docs/ML1110/ML111030453.pdf. "The objective" of the instruction was "to independently verify that licensees are adequately prepared to prevent and/or mitigate the consequences of selected safety/licensing bases events and to evaluate the adequacy of those emergency prevention and/or mitigation strategies for dealing with the consequences of selected beyond safety/licensing bases events." Id. at 1. Among other things, the Instruction triggered a nationwide round of inspections which would be used "to evaluate readiness for such an event and to aid in determining whether additional regulatory actions by the U.S. Nuclear Regulatory Commission are warranted." Id.

In accordance with the Instruction, the NRC conducted an inspection of Metropolis Works over a four-day period from May 21 to May 24, 2012. Id. at 8 (citing Compl. ¶ 18).[2] Based on that inspection, an NRC report completed the following summer identified two apparent violations of its regulations at the facility: (1) the failure to identify all relevant accident sequences related to credible seismic events and tornadoes that could result in large uranium hexafluoride (UF$_6$) releases for which protective actions might be needed as required by 10 C.F.R. § 40.31(j)(3); and (2) the failure to provide complete and accurate information related to the facility's emergency response plan as required by 10 C.F.R. § 40.9(a). App. to Pl.'s Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. to Dismiss ("Pl.'s App.") at 5, ECF No. 13-2.

### B.   Honeywell Commits To Take Corrective Action in Response to the NRC's Findings

In a July 11, 2012 letter responding to the NRC report, Honeywell agreed to suspend its previous timetable for resuming operations at Metropolis Works. It advised that in light of the findings of the inspection, "and based on clear direction from the NRC," it "[would] not begin new UF6 production until [it] complete[d] [its] review of the inspection results and develop[ed] an appropriate response." Id. at 19. In particular, it "confirm[ed]" it would not begin such production before "submitting to the NRC an action plan and schedule for addressing the

---

[2] At the time of the NRC inspection, the Metropolis Works facility had been closed for a planned maintenance outage since May 9, 2012. App. to Def.'s Mot. to Dismiss ("Def.'s App.") at A11, ECF No. 12-1.

[Inspection Report's] findings." Id. at 20. Honeywell agreed to discuss its plan with the NRC as soon as possible, including "whether any license amendment is required." Id.

The NRC responded to Honeywell's proposal with a "Confirmatory Action Letter" dated July 13, 2012. The letter's purpose was "to confirm the written commitments made by Honeywell Metropolis Works" in its July 11 letter, "and in discussions with members of [NRC] staff on July 12, 2012 regarding the actions [Honeywell Metropolis Works would] take to resolve safety concerns." Id. at 21. Specifically, the NRC confirmed that Honeywell would: 1) suspend certain operations related to $UF_6$ production until Honeywell "completed [its] analysis of the issue and developed and implemented corrective actions, including actions to ensure that the facility Emergency Response Plan adequately protects public health and safety"; and 2) "[o]btain written consent from the NRC permitting the resumption of NRC licensed operation" of Metropolis Works. Id.

## C.    The NRC Issues a Confirmatory Order

On August 27, 2012, the NRC held a "Pre-decisional Enforcement Conference" with Honeywell "to discuss the apparent violations, root and contributing causes, and corrective actions." Id. at 27 (letter from NRC to Honeywell summarizing events). On the same date, at a public meeting, "Honeywell discussed the proposed plant modifications to address the safety concerns at the Metropolis Works facility with NRC staff." Id. Honeywell later provided a detailed written list of proposed plant modifications to the NRC at the agency's request. Id.

Some six to seven weeks later, on October 15, 2012, the NRC issued Confirmatory Order No. NRC-2012-0244 ("the Confirmatory Order"). Id. at 32–41. The agency issued the Confirmatory Order because it had "conclud[ed] that significant corrective actions at the Metropolis Work facility [were] necessary to provide reasonable assurance of public health and safety." Id. at 34. The NRC further explained that "formalizing the corrective action proposed by Honeywell necessitates the issuance of this Confirmatory Order." Id. The NRC advised that it was issuing the Confirmatory Order "[c]onsistent with Section 3.7 of NRC's Enforcement Policy . . . in lieu of issuance of a Notice of Violation and consideration of civil penalties for the apparent violations described above." Id.[3] Honeywell consented to the issuance of the Confirmatory Order and waived its right to a hearing under 10 C.F.R. § 2.202. Id.

The Confirmatory Order required Honeywell to take a series of actions to resolve the regulatory violations, some of which Honeywell had already agreed to take as reflected in the Confirmatory Action Letter, and others that were new. These included, among others, requirements that Honeywell: (1) submit certain documentation for review; (2) "develop, implement, and have available for NRC inspection [certain] quality assurance measures"; (3) implement agreed-upon plant modifications; (4) after completing the foregoing items, seek and obtain written approval from the NRC before resuming licensed operations; (5) demonstrate the

---

[3] Section 3.7 of the NRC's Enforcement Policy is entitled "Exercise of Discretion to Issue Orders." Pl.'s App. at 179. It states that "[t]he NRC may exercise discretion, where necessary or desirable, by issuing Orders with or in lieu of civil penalties to achieve or formalize corrective actions and to deter further recurrence of serious violations." Id.

adequacy of its Emergency Response Plan ("ERP") through an onsite exercise at least fifteen days before resuming operations; and (6) "submit a revised [Integrated Safety Analysis] Summary . . . to the NRC no later than six months after resuming licensed operations." Id. at 36–37.

The Order also directed the modification of Honeywell's license to operate the Metropolis Works facility to incorporate the required conditions and corrective actions. Id. at 35. The Confirmatory Order further specified that "[c]ontingent upon [Honeywell] satisfying its commitments under this Order, the NRC will not pursue further enforcement action based on the two apparent violations described in Section II of this Order." Id. at 35.

### D.    Honeywell's Compliance with the Confirmatory Order

In November 2012, Honeywell began submitting documentation and taking the other corrective actions required by the Confirmatory Order. According to Honeywell, compliance with the Order required it to make "capital improvements total[ing] more than $50 million." Pl.'s Mem. of Law in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Mem.") at 7, ECF No. 13-1.

The NRC conducted inspections to evaluate Honeywell's compliance with the Confirmatory Order over the three-month period between April 1, 2013 and June 30, 2013. Pl.'s App. at 46. According to a report dated June 14, 2013, "no violations of NRC requirements were identified" during these inspections. Id. at 49. The NRC accordingly authorized Honeywell to resume $UF_6$ production on July 2, 2013. Id. at 75.

In accordance with the Confirmatory Order, Honeywell then submitted its revised Integrated Safety Analysis Summary, which the NRC approved on June 17, 2014. Id. On July 21, 2014, the NRC found that "Honeywell ha[d] satisfied the terms of the Confirmatory Order," and declared the Confirmatory Order closed. Id. at 74–75.

### E.    Honeywell Objects to the Assessment of Part 170 Fees

Over the period from June 2013 through January 2014, the NRC sent Honeywell five invoices totaling $2,884,126 for what it characterized as "Part 170" services provided in connection with the Confirmatory Order. Pl.'s Mem. at 7. Honeywell maintains that of the total fees assessed, $1,985,190 was attributable to "inspections and other licensing fees in furtherance of the Confirmatory Order." Id.[4] It claims that under Footnote 2, those costs should not have been charged to it under Part 170. Id. at 7–8.

Honeywell paid each invoice, but also contemporaneously disputed the assessment of Part 170 fees related to the Confirmatory Order, in accordance with the procedures set forth at 10 C.F.R. § 15.31. See Pl.'s App. at 107–34 (letters from counsel for Honeywell disputing portions of five invoices ("the dispute letters")). The NRC responded to each dispute letter, denying

---

[4] Honeywell notes that a mathematical error affected the amount of the demand listed in its complaint. See Pl.'s Mem. at 7 n.1. According to Honeywell's briefing, the sum in dispute, which Honeywell alleges was illegally exacted, is $1,985,190, including $100,000 the government has admitted is owed to Honeywell. Id. at 7–8 & n.1; see note 5, infra.

Honeywell's requests to refund portions of the fees charged for inspections and other work related to the Confirmatory Order. Id. at 135–43.

In responding to Honeywell's letters, the NRC acknowledged that, in accordance with Footnote 2, the NRC does not assess fees "for enforcement activities in the Part 170 fee schedules." Id. at 136 (letter from NRC responding to Honeywell's February 22, 2013 letter) (citing Footnote 2). However, the NRC "disagree[d] with Honeywell's assertion that [Footnote 2] applies here." Id. It stated that, in its view, the exception was inapplicable because: 1) the Confirmatory Order, by its own terms, was implemented "in lieu of issuance of a Notice of Violation and consideration of civil penalties for the apparent violations [identified in the Order]"; and 2) Honeywell had voluntarily consented to the Confirmatory Order and the actions it required. Id. (emphasis omitted). Elaborating on the significance of these two factors, the NRC explained that "[t]he terms 'civil sanctions' and 'civil penalties' imply a level of coercion and a lack-of-choice on the part of the licensee." Id. at 137. Because the Confirmatory Order "merely 'confirmed' Honeywell's proposed actions," the NRC stated, "it [could not] be formally viewed as an order that relates to a civil sanction/penalty under a commonsense understanding of those terms." Id.

Following the initial exchange of correspondence related to the first invoice sent in January 2013, the NRC sent Honeywell four additional invoices. Honeywell and the NRC exchanged additional letters setting forth similar arguments in connection with each of those four invoices. See id. at 114–34, 138–43. The NRC found in each instance that the fees were properly charged to Honeywell under 10 C.F.R. § 170.31, because the exception contained in Footnote 2 was not applicable. Id. at 138–43.[5]

## III.    Procedural Background

Honeywell filed a complaint in this court on February 16, 2018. ECF No. 1. The complaint sets forth a single cause of action alleging an illegal exaction, id. ¶¶ 39–45, and requests damages "equal to the illegally exacted Part 170 fees for activities undertaken in furtherance of the Confirmatory Order," id. at 12.

On June 18, 2018, following the grant of several extensions of time, the government filed a motion to dismiss Honeywell's complaint for failure to state a claim, pursuant to RCFC 12(b)(6). ECF No. 12. One month later, Honeywell filed its response and cross-motion for summary judgment. ECF No. 13. Additional briefing on the parties' motions followed with the government's reply and response on August 8 (ECF No. 14) and finally Honeywell's reply in

---

[5] The Court notes, however, that in one of these subsequent letters the NRC acknowledged that it had erred in charging Honeywell approximately $100,000 for some 370 hours spent preparing the Confirmatory Order itself. The parties agree that to date, the NRC has not issued Honeywell the $100,000 refund it was promised in that letter. See Def.'s Mot. at 10 n.3; Pl.'s Mem. at 8–9 n.3; Pl.'s App. at 143.

support of its cross-motion on August 22 (ECF No. 15). Oral argument was held on the parties'
motions on February 21, 2019.

## DISCUSSION

### I.    Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction "to render
judgment upon any claim against the United States founded either upon the Constitution, or any
Act of Congress or any regulation of an executive department, or upon any express or implied
contract with the United States, or for liquidated or unliquidated damages in cases not sounding
in tort." 28 U.S.C. § 1491(a). An illegal exaction claim "may be maintained [under the Tucker
Act] when 'the plaintiff has paid money over to the Government, directly or in effect, and seeks
return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in
contravention of the Constitution, a statute, or a regulation.'" Aerolineas Argentinas v. United
States, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996) (quoting Eastport S.S. Corp. v. United States,
372 F.2d 1002, 1007 (Ct. Cl. 1967)).

Honeywell has alleged that the NRC illegally exacted almost $2 million in fees from it
"in contravention of . . . a regulation [i.e., 10 C.F.R. § 170.31 n.2 (Footnote 2)]." Accordingly,
the Court has subject-matter jurisdiction over Honeywell's claim.

### II.    Merits

The facts in this case are not in dispute. Resolution of the parties' motions turns on a pure
issue of law—i.e., the interpretation of Footnote 2. As noted above, that regulation provides in
pertinent part that:

> Fees [described in 10 C.F.R. § 170.31] will not be charged for orders related to civil
> penalties or other civil sanctions issued by the Commission under 10 C.F.R. § 2.202
> or for amendments resulting specifically from the requirements of these orders. For
> orders unrelated to civil penalties or other civil sanctions, fees will be charged for
> any resulting licensee-specific activities not otherwise exempted from fees under
> this chapter.

Honeywell contends that the October 15, 2012 Confirmatory Order, which both parties agree
was issued under 10 C.F.R. § 2.202, imposed a "civil sanction" on Honeywell and that it also
resulted in an amendment to the license for the Metropolis Works facility. Therefore, Honeywell
argues, it may not be charged Part 170 fees for the document review, inspections, and other
services the NRC performed to verify compliance with the Order. Instead, according to
Honeywell, the costs of those activities must be borne by the annual Part 171 fees the NRC
collects from the industry as a whole.

The government, on the other hand, argues that the Confirmatory Order did not impose a
"civil penalty or other civil sanction" on Honeywell. It reasons that the Order was "non-punitive
in nature" and "merely served as a means to ensure that the company rectify certain
safety-related issues." Def.'s Mot. at 17. The government further contends that this interpretation
of the regulation is entitled to deference under the principles set forth in Auer v. Robbins, 519

U.S. 452 (1997), and its progeny. Id. at 15–16 (quoting Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 613 (2013); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). For the reasons set forth below, the Court concludes that the Confirmatory Order imposed "other civil sanctions" on Honeywell within the meaning of Footnote 2. Part 170 fees are therefore not chargeable to Honeywell for the work the NRC performed in connection with the Confirmatory Order. The government's motion to dismiss must therefore be **DENIED** and Honeywell's cross-motion for summary judgment as to liability must be **GRANTED**.

### A.    Standards Governing the Interpretation of Regulations

"When construing an agency regulation as a matter of law," a court will "use basically the same rules it would use in construing a statute." Glycine & More, Inc. v. United States, 880 F.3d 1335, 1344 (Fed. Cir. 2018) (citation omitted). First, the court looks at the "plain language" of the regulation and "consider[s] its terms in accordance with their common meaning." Lockheed Corp. v. Widnall, 113 F.3d 1225, 1227 (Fed. Cir. 1997). "When the regulation is unambiguous, 'it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.'" Glycine & More, 880 F.3d at 1344 (quoting Tesoro Haw. Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005) (quoting Gibson v. United States, 194 U.S. 182, 185 (1904))).

Where the language of a regulation is ambiguous, it may be appropriate to defer to the agency's interpretation. Christensen v. Harris Cty., 529 U.S. 576, 588 (2000). In such circumstances, Auer v. Robbins dictates that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." 519 U.S. 452, 461 (1997) (internal quotations and citations omitted). Auer's "general rule" affording deference to an agency's interpretation, however, does not apply in all cases where the regulation is ambiguous. Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012). Such deference may be "unwarranted" where: (1) "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question"; (2) "it appears that the interpretation is nothing more than a convenient litigating position"; or (3) it appears the interpretation is "a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." Id. (internal quotations, citations, and alteration omitted).

### B.    The Language of the Regulation at Issue

As noted, the pertinent regulation states that "[Part 170] [f]ees will not be charged for orders related to civil penalties or other civil sanctions issued by the Commission under 10 C.F.R. § 2.202 or for amendments resulting specifically from the requirements of these orders." 10 C.F.R. § 170.31 n.2. It is undisputed that the Confirmatory Order was issued "under 10 C.F.R.

§ 2.202."[6] It is further undisputed that no "civil penalty" was imposed on Honeywell in connection with the Confirmatory Order.[7] The sole question before the Court, therefore, is whether the fees at issue were charged for an "order[] related to . . . other civil sanctions" and/or "for amendments resulting specifically from the requirements of th[at] order[]" within the meaning of Footnote 2.

The regulations do not define the term "civil sanctions." The Court therefore will be guided by the common meaning of that term as well as the NRC's own usage in other agency issuances. See Glycine & More, Inc., 880 F.3d at 1344 (in interpreting regulation's language, a court may consider the language of related regulations).

Black's Law Dictionary defines a "sanction" as "[a] penalty or coercive measure that results from failure to comply with a law, rule, or order." SANCTION, Black's Law Dictionary (10th ed. 2014) (emphasis supplied). Thus, in common legal parlance, a "sanction" need not be punitive in nature; as noted, the word "sanction" also includes "coercive measures" that are implemented in order to enforce compliance with laws, rules, and regulations. See also id. (a "sanction" is "a provision that gives force to a legal imperative by either rewarding obedience or punishing disobedience"); U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 621 (1992) ("[T]he meaning of 'sanction' is spacious enough to cover not only what we have called punitive fines, but coercive ones as well."); In re Yan Sui, 713 F. App'x 642, 642 (9th Cir. 2018) ("The bankruptcy court did not abuse its discretion by imposing non-punitive sanctions against appellants."); Saad v. Sec. & Exch. Comm'n, 873 F.3d 297, 301 (D.C. Cir. 2017) (recognizing that a "sanction [may be] remedial rather than punitive"); Chamber of Commerce of U.S. v. Edmonson, 594 F.3d 742, 765 (10th Cir. 2010) (observing that that ordinary meaning of the word "sanction" is "a restrictive measure used to punish a specific action or to prevent some future activity"); United States v. Stoller, 78 F.3d 710, 715 (1st Cir. 1996) (observing that for purposes of double jeopardy analysis, "not all civil sanctions constitute cognizable punishment"); United States v. Hudson, 14 F.3d 536, 540–41 (10th Cir. 1994) ("[S]anctions are [not] necessarily presumed to be punitive when the express language" of the relevant statute or regulation "allows for remedial sanctions.").

The provisions of the NRC's official Enforcement Policy ("the Policy") and related Enforcement Manual ("the Manual") reflect that the agency has similarly understood that the

---

[6] 10 C.F.R. § 2.202(a)(1) (entitled **"**Orders") provides that the NRC "may institute a proceeding to modify, suspend, or revoke a license or to take such other action as may be proper" by serving on the affected licensee "an order that will . . . [a]llege the violations with which the licensee . . . is charged, or the potentially hazardous conditions or other facts deemed to be sufficient ground for the proposed action, and specify the action proposed." The regulation gives adversely affected licensees a right to notice and an opportunity to be heard, including an evidentiary hearing. 10 C.F.R. § 2.202(a)(1)–(5), (b), (c).

[7] The NRC's Enforcement Manual defines a "civil penalty" as a "monetary fine that is used to emphasize compliance in a manner that deters future violations and to focus [the] licensee's attention on significant violations." Pl.'s App. at 248; see also 42 U.S.C. § 2282 (entitled "Civil Penalties" and authorizing fines of up to $100,000 for each type of violation specified therein).

term "sanction" includes those Orders that the NRC employs to enforce compliance with existing laws, rules, and regulations.[8] Thus, the Manual characterizes "notices of violation, civil penalties, and orders" as the "three primary enforcement <u>sanctions</u>" available to the agency. App. to Def.'s Mot. to Dismiss ("Def.'s App.") at A19, ECF No. 12-1 (emphasis supplied). Further, the Policy defines an "Order" as "a written NRC directive to modify, suspend, or revoke a license; to cease and desist from a given practice or activity; or to take such other action as may be proper." Pl.'s App. at 169; <u>see also id.</u> at 249 (Manual provision stating that "orders can be used to modify, suspend, or revoke licenses or require specific actions by licensees or other persons"). Finally, the Manual distinguishes between "enforcement orders" like the Confirmatory Order (which are used "for the purpose of restoring compliance with existing regulations") and non-enforcement "safety or security orders" (which are "issued to impose safety or security related requirements on licensees based on the NRC's determination that the requirements of existing regulations or licenses are not sufficient [to adequately ensure] the public health and safety or the common defense and security"). U.S. Nuclear Regulatory Comm'n, Office of Enforcement, <u>Nuclear Regulatory Commission Enforcement Manual</u> 154 (Revision 10, Change 2, Apr. 30, 2018), https://www.nrc.gov/docs/ML1801/ML18018B134.pdf ("Manual").

The Confirmatory Order that the NRC issued to Honeywell is clearly an "enforcement" order or sanction" under the Manual. The agency identified apparent violations of two NRC regulations—10 C.F.R. §§ 40.31(j)(3) and 40.9(a)—during inspections that it conducted pursuant to Temporary Instruction 2600/015. Pl.'s App. at 27. Although Honeywell committed to take voluntary corrective action as described in an NRC Confirmatory Action Letter, some six weeks after its issuance, the NRC held a "Pre-decisional Enforcement Conference" ("PEC") with Honeywell. <u>Id.</u> As the Manual explains, while some violations of NRC regulations are subject to criminal prosecution, "[a]ll violations are subject to civil enforcement action." <u>Id.</u> at 248. The purpose of a PEC is therefore "to obtain information that will assist the NRC in determining the appropriate enforcement action." <u>Id.</u> at 249; <u>see also id.</u> at 237 (observing that "[t]he NRC staff may exercise discretion in determining the appropriate enforcement <u>sanctions</u> to be taken") (emphasis supplied).

Based on the PEC, the NRC concluded that "significant corrective actions at the Metropolis Work[s] facility [were] necessary to provide reasonable assurance of public health and safety." <u>Id.</u> at 34. Among the three enforcement sanctions available to it, the NRC decided to issue a Confirmatory Order, "in lieu of issuance of a Notice of Violation and consideration of civil penalties for the apparent violations." <u>Id.</u>

The Confirmatory Order was issued "[c]onsistent with Section 3.7 of NRC's Enforcement Policy," <u>id.</u>, which authorizes the NRC to issue orders to "achieve or formalize corrective actions and to deter further recurrence of serious violations," <u>id.</u> at 179. It obliged

[8] The NRC Enforcement Manual is "the primary source of guidance" for NRC staff in the "implementation of the NRC enforcement program." Def.'s App. at A18. The Manual "contains specific processes and guidance for implementing [the NRC Enforcement] Policy," and was "written to be consistent with [the] Enforcement Policy." Pl.'s App. at 148 (NRC Enforcement Policy).

Honeywell to take a series of corrective actions to avert "further enforcement action based on the two apparent violations." Id. at 35. It also modified Honeywell's license to incorporate the required corrective actions. The Order therefore was an "enforcement sanction," within the meaning of the NRC's own Policy and Manual, regardless of whether its purpose was a "punitive" one or whether it was instead intended to coerce compliance with existing regulations.

Finally, the Court notes that the government's contention that an Order must be punitive in nature in order to impose a "civil sanction" under Footnote 2 collides with the Manual's explanation of the purposes of the civil penalties it imposes, which are explicitly within the scope of the exception set forth at Footnote 2. Thus, the Manual explains that "the purpose of a civil penalty is not retributive, but remedial," and that it should 1) "[e]ncourage licensees to take effective and lasting corrective actions to avoid future problems by being in compliance"; and 2) "[c]reate a deterrent that will prevent future violations, both for the individual licensee and for other, similar licensees." Manual at 142. In other words, the NRC does not charge licensees Part 170 fees in connection with the imposition of civil penalties, notwithstanding that it considers those penalties to have remedial rather than punitive purposes. It is unreasonable therefore to read the exception set forth at Footnote 2 for "civil sanctions" as encompassing only those that are punitive in nature.[9]

### C.   The Government's Deference Argument

Notwithstanding the foregoing, the government contends that the Confirmatory Order did not impose a "sanction" on Honeywell because it was "non-punitive in nature and merely served as a means to ensure the company rectify certain safety related issues." Def.'s Mot. at 17. A sanction, the government contends, is "a measure, such as a civil monetary penalty or a ban on involvement in licensed activities, that penalizes a person for violating NRC requirements." Def.'s Reply in Supp. of Its Mot. to Dismiss & Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s Reply") at 3.

The government cites no NRC regulation, directive, or guidance that supports its contention that the word "sanction" encompasses only measures that are punitive in nature. Nonetheless, citing the Auer v. Robbins line of cases, it asserts that the interpretation of the regulation that it has proffered in this litigation is entitled to the heightened deference traditionally afforded to an agency's interpretation of its own regulations. Def.'s Mot. at 15 (quoting Shalala, 512 U.S. at 512); see also id. (observing that the agency's interpretation "need not be the only possible reading of a regulation—or even the best one—to prevail") (quoting Decker, 568 U.S. at 613).

The Court rejects the government's argument that its interpretation of Footnote 2 is entitled to deference. As the Supreme Court has observed, Auer deference is "warranted only when the language of the regulation is ambiguous." Christensen, 529 U.S at 588. For the reasons set forth above, the Court concludes that the language of Footnote 2 is not ambiguous. The plain

---

[9] Because the Court concludes that the fees were charged for an "order[] related to . . . other civil sanctions," it does not decide whether the fees could also be characterized as having been charged "for amendments resulting specifically from the requirements of th[at] order[]."

meaning of the word "sanction," confirmed by the NRC's use of that word in the Manual, includes the orders like the one at issue here, which—based on a finding of violations of NRC regulations—require a licensee to shut down its operations until the NRC is satisfied that the licensee's facility has been brought into compliance.

Second, the interpretation of the regulations proffered in the government's briefs is not entitled to deference because it is inconsistent with the interpretation the NRC applied at the administrative level and so "does not reflect the agency's fair and considered judgment on the matter in question." Christopher, 567 U.S. at 155. Instead, it appears to represent the quintessential "convenient litigating position" or "post hoc rationalization" for the fee assessment decision that is the subject of Honeywell's lawsuit. Id.; see also Boyd v. Office of Pers. Mgmt., 851 F.3d 1309, 1314 n.2 (Fed. Cir. 2017) ("[E]ven in its most vigorous form," the practice of deferring to an agency's interpretation of its own regulations does not support an interpretation contained in the agency's brief that was inconsistent with regulatory language and also differed from the position the agency took when it applied the regulations to the plaintiff.).

In this case, the NRC did not suggest in responding to Honeywell's dispute letters that the critical reason for its assessment of Part 170 fees was the nonpunitive nature of the Confirmatory Order. Instead, it relied upon a now-abandoned theory: that Honeywell had "consented" to the Order, rendering it not "coercive" as is required for the Order to be considered a "sanction."

Thus, the agency acknowledged that "the NRC's fee rule draws a distinction between enforcement activities (which benefit the public at large) and specific licensing reviews" and that the NRC "does not assess fees for enforcement activities in the Part 170 schedules." Pl.'s App. at 136 (citing Footnote 2). The Confirmatory Order, the NRC observed, was issued "in lieu of" a notice of violation or a civil penalty. Id. Turning to the effect of the Order itself, the NRC emphasized Honeywell's "consent" to its issuance, reasoning that the terms "civil sanctions" and "civil penalties" "imply a level of coercion and lack-of-choice on the part of the licensee." Id. at 137. Because the Confirmatory Order "merely 'confirmed' Honeywell's proposed actions," the agency reasoned, it "cannot be formally viewed as an order that relates to a civil sanction/penalty under a commonsense understanding of those terms." Id.

Before this Court, the government has abandoned the lynchpin of the NRC's rationale below—that a "civil sanction" "implies a level of coercion and lack-of-choice on the part of the licensee," not present here because Honeywell "consented" to the issuance of the Confirmatory Order. Id. Perhaps the NRC no longer takes this tack because, under 10 C.F.R. § 2.202(d), "[a]n order that has been consented to" has "the same force and effect as an order made after hearing by a presiding officer or the Commission." But more to the point, the government no longer argues that the Order was not coercive. Instead it argues that, regardless of whether the Confirmatory Order was coercive, it did not impose a "sanction" because it was not "punitive in nature." See, e.g., Def.'s Mot. at 16. Put another way, the government's litigating position is that orders are not related to "civil sanctions" for purposes of Footnote 2 where they "merely serve[] as a means to ensure the company rectify certain safety related issues"—even if the "means" are, as here, coercive in nature. Id. at 17.

13

In short, the position taken in this litigation is decidedly different from the position the NRC took below. Its newly minted interpretation of the NRC regulation is therefore entitled to no deference.

### D.      Regulatory History

The government contends that if the phrase "other civil sanctions" includes confirmatory orders that require licensees to take action to cure violations of existing law, then virtually all NRC orders would be considered sanctions because "virtually all NRC Orders contain some compulsory instruction." Id. at 20. According to the government, in 2005 "the NRC specifically amended" Footnote 2, "which [had] previously applied to all orders, to distinguish between th[o]se orders that are punitive in nature and those that are not." Id. (citing Def.'s App. at A30–31 (Revision of Fee Schedules; Fee Recovery for FY 2005, 70 Fed. Reg. 30,526, 30,526–28 (May 26, 2005) (to be codified at 10 C.F.R. pts. 170 & 171))).

Neither of these points is well taken. First, an order does not impose a civil sanction merely because it contains a compulsory instruction. As described above, the word "sanction" typically connotes an enforcement action taken in response to a violation of an existing law, rule, or regulation. Not all orders which contain compulsory instructions arise in the enforcement context. As the Manual contemplates, in addition to enforcement orders, the NRC also issues "safety or security orders" which are "typically issued to impose safety or security related requirements on licensees based on the NRC's determination that the requirements of existing regulations or licenses are not sufficient." Manual at 154.

Indeed, the regulatory history upon which the government relies highlights the distinction between orders that are issued to enforce existing requirements and other orders that also contain compulsory instructions. Before 2005, Part 170 fees were not assessed "for amendments or other licensee-specific activities resulting from the requirements of Commission orders." Pl.'s App. at 301. The NRC assessed fees for all licensee-specific activities resulting from all Commission orders under Part 171. Its reasoning was that "in cases where the order proposes the imposition of a civil penalty or other civil sanctions, the assessment of additional costs could be viewed as augmenting the amount of the civil penalty and could discourage licensees from contesting enforcement actions." Id.

By 2005, however, the NRC recognized that its "use of orders to impose additional requirements for safety or security reasons ha[d] increased." Id. (emphasis supplied). In particular, "subsequent to the September 11, 2001, terrorist attacks, the Commission imposed security requirements on various groups of licensees through orders. These orders resulted in the NRC's review of licensee-specific amendments and other activities that normally would have been billable under part 170, except that they were associated with orders." Id. (emphasis supplied).[10]

---

[10] Examples of such Orders include the NRC's Order of March 29, 2002 (Pl.'s App. at 280–81) and the NRC's Order of August 18, 2004 (Pl.'s App. at 285–91).

Accordingly, in 2005, the NRC amended 10 C.F.R. §§ 170.21 and 170.31 "to provide that part 170 fees will be assessed for any licensee-specific activity resulting from orders issued by the Commission not related to civil penalties or other civil sanctions." Id. As a result, licensee-specific activities that were related to orders imposing new security requirements—as opposed to enforcing existing ones—would be billable under Part 170, while orders related to civil penalties or other civil sanctions would continue to be billable under Part 171.

It is undisputed that the Confirmatory Order did not impose new security requirements on Honeywell. Rather, it sought to secure Honeywell's compliance with existing regulations by implementing sanctions that required Honeywell to take specified corrective actions as a condition of reopening the Metropolis Works facility.

Nonetheless, the government contends that its interpretation of the changes made in 2005 is supported by a rationale the NRC provided for continuing to assess fees under Part 171 for orders related to civil penalties or other civil sanctions. Thus, as noted above, the NRC explained that "in cases where the order proposes the imposition of a civil penalty or other civil sanctions, the assessment of additional costs could be viewed as augmenting the amount of the civil penalty and could discourage licensees from contesting enforcement actions." Id. This rationale, the government contends, does not apply to orders that do not result in the imposition of fines (i.e., civil penalties).

The Court disagrees. Orders that impose nonpunitive civil sanctions that require licensees to take significant corrective action—as did the Confirmatory Order at issue in this case—also impose costs on licensees. Indeed, Honeywell notes that as a result of the Confirmatory Order, it was "required to immediately shut down production and make $50 million in unplanned capital improvements to [the Metropolis Works] facility." Pl.'s Mem. at 17. Further, the imposition of fees in cases that involve enforcement sanctions could have a similar deterrent effect on licensees who might otherwise wish to contest those actions.

The regulatory history, in short, does not evince an intent to distinguish between punitive and nonpunitive orders. Instead, the purpose of the 2005 change was to continue to assess fees under Part 171 for orders related to civil penalties and other civil sanctions (whether punitive or not), while assessing fees under Part 170 where the orders involved the imposition of new requirements on licensees.

**E.      The Government's Reliance on Enforcement Manual Provisions Concerning the Statute of Limitations**

The government seeks support for its narrow definition of the word "sanction" in a provision of the Manual that discusses 28 U.S.C. § 2462—the five-year statute of limitations which applies to "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." Specifically, the Manual states that the five-year limitations period "is applicable to NRC civil penalty cases . . . and requires that the NRC initiate an action imposing a civil penalty, issuing an order to modify, suspend, or revoke a license or an order prohibiting involvement in NRC licensed activity . . . within the 5-year statutory period." Def.'s App. at A21. The Manual further states that the statute of limitations is "an affirmative defense which can be raised by a person against whom such a sanction is imposed" and that the statute

15

"does not prevent the staff from issuing a "[Notice of Violation] (without a civil penalty or other sanction)." Id. (emphasis supplied). In addition, the Manual states that the statute does not prevent the NRC "from issuing an order requiring an action needed to ensure compliance with existing requirements regarding protection of the public health and safety, promoting the common defense and security, or protecting the environment." Id. According to the government, because the Manual refers to orders limited by the statute of limitations as "sanctions," an order that is not subject to the statute of limitations—i.e., an order "requiring an action needed to ensure compliance with existing requirements"—is not a "sanction." See Def.'s Mot. at 18–19.

There are several flaws in this line of logic. To begin with, the Manual explicitly states that an order modifying a license is subject to the five-year limitations period. Def.'s App. at A21. By the government's logic, therefore, the Confirmatory Order which modified Honeywell's license was a "sanction."

Second, and in any event, the statute-of-limitations provision itself does not use the word "sanction." The fact that the Manual uses the word "sanction" in reference to the actions subject to the limitations period does not mean that actions not subject to 28 U.S.C. § 2462 cannot also involve "sanctions." Indeed, as described above, the Manual elsewhere references the issuance of a Notice of Violation as one of three "primary enforcement sanctions" even though the Manual expressly identifies a Notice of Violation as not being subject to 28 U.S.C. § 2462.

In short, the Court finds this line of argument attenuated and unpersuasive. The Manual provisions referencing 28 U.S.C. § 2462 do not support the government's contention that the word "sanction" as used in Footnote 2 includes only punitive actions subject to the limitations period.

**F.      Arguments Based on the Statutory Fee Scheme**

Finally, the government argues that its interpretation of the scope of Footnote 2 is supported by the overarching principles of the NRC's fee scheme: i.e., that individual licensees (rather than all members of the licensee's class) will bear the cost of services that provide them with special benefits beyond those enjoyed by the general public. Def.'s Mot. at 24 (citing OMB Circular A-25). According to the government, the services the NRC provided to ensure Honeywell's compliance with the Confirmatory Order provided it with "special benefits" because they allowed it to safely resume business at Metropolis Works. Id. On the other hand, according to the government, the services "did not have any quantifiable benefit to the general public." Id.

These contentions lack merit. To be sure, the work the NRC performed to ensure compliance with the Confirmatory Order "benefitted" Honeywell in the sense that Honeywell could not resume full operations at Metropolis Works until the NRC found it compliant. But the Order itself did not benefit Honeywell; to the contrary, the Order required Honeywell to shut down its operations until it took specified remedial actions. In addition, it was as a result of the Order that Honeywell was required to expend significant capital funds to undertake the corrective actions the NRC directed.

Similarly, the Court is unpersuaded by the government's argument that the general public did not secure any "quantifiable" benefit from the Confirmatory Order. It is unclear to the Court what the government means by a "quantifiable" benefit. But its effort to downplay the Confirmatory Order's public purposes flies in the face of the stated goal of the NRC's underlying enforcement efforts, which was to protect the health and safety of the public at large by ensuring that the Metropolis Works facility was prepared to withstand catastrophic natural and other disasters on the scale of the Fukushima Daiichi nuclear disaster. The Court thus finds the government's arguments based on the overall statutory fee scheme unavailing.

## CONCLUSION

On the basis of the foregoing, the government's motion to dismiss is **DENIED** and Honeywell's cross-motion for summary judgment is **GRANTED** as to liability. The parties shall file a joint status report proposing further proceedings in this case within thirty days of the date of this Opinion.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge